[Crim. No. 37215. Second Dist., Div. Five. Dec. 22, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
MATIAS DE ANDA, Defendant and Appellant.

**COUNSEL**

Seymour I. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman, Robert R. Anderson and Elizabeth A. Baron, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.**—Defendant, Matias De Anda, was charged with assault with intent to commit murder (count I, Pen. Code, § 217) and it

was alleged that during the commission of the offense he used a deadly or dangerous weapon. He was also charged with assault with a deadly weapon (count II, Pen. Code, § 245, subd. (a)). Defendant pleaded not guilty, not guilty by reason of insanity and denied the use of a deadly weapon. Later, he withdrew his plea of not guilty to count II and factually admitted the charge of assault with a deadly weapon, as charged therein.[1] His plea of not guilty by reason of insanity remained. Pursuant to stipulation, the court read and considered the preliminary hearing transcript and the reports of Drs. Sheel, Vogeler, Jr., and Thurston and with respect to count II, the court found defendant not guilty by reason of insanity. Upon motion of the People, the court requested an additional report from defendant's current psychiatrist (Dr. Marrero) as to whether he had recovered his sanity and whether or not he was a present danger to himself or others.

After a sanity hearing, the court stated that it was not convinced that defendant had regained his sanity or was not a danger to himself or others. Therefore, defendant was committed to the Department of Mental Health for placement at Camarillo State Hospital for 90 days pursuant to Penal Code section 1026. However, execution of the commitment was stayed for 30 days pending an appeal. Defendant was ordered to continue treatment as an outpatient at the Department of Mental Health.

He now appeals contending (1) that the evidence clearly showed that he had recovered his sanity under Penal Code section 1026 because medication and treatment had removed all threat to others and himself; (2) that he was eligible for outpatient treatment without first undergoing a mandatory 90-day confinement; (3) that he was deprived of due process of law because the 90-day commitment bears no reasonable relationship to the purpose for which he was being committed; (4) that due process of law was violated by a statutory requirement that a court commit the defendant notwithstanding substantial evidence supporting the court's conclusion that such disposition is unnecessary and a less onerous order for outpatient treatment would be appropriate; (5) that defendant was denied equal protection of law by the provisional 90-day commitment; (6) that the court abused its discretion in committing defendant to the hospital since "there was no direct evidence rebutting the finding that mandatory hospitalization would be detrimental to order

---

[1]At the hearing of April 24, 1979, it was decided that count I would be dismissed "at the time of the final determination".

hospitalization"; (7) that statutory construction principles dictate a result that gives a trial court the option to order an accused to undergo outpatient treatment; (8) that the case should be remanded to the trial court for a disposition consistent with the amendments to Penal Code section 1026 as set forth in Assembly Bill No. 2751; (9) that the courts possess an inherent equity power based on the individual facts to mitigate the harshness of the statute; (10) that under the doctrine of *ejusdem generis* the mandatory provisions of Penal Code section 1026, subdivision (b) do not apply to a Penal Code section 245 conviction; and (11) that the case should be remanded to the trial court for a determination as to whether a violation of Penal Code section 245 falls within the definition of an offense that triggers the mandatory commitment imposition.

In his reply brief defendant argues that "it is repugnant to fundamental constitutional doctrine to construe a statute to mandate a possible destruction of the human spirit." He concluded by stating, "In the case at the bar we are dealing with the highest inalienable right of the individual, the very core of the existence of the particular person and whether it is characterized as due process, equal protection as inalienable right a law that demands the destruction of the individual as is possible in this case cannot withstand constitutional attack."

On December 7, 1978, defendant stabbed his wife in the head and stomach with a long kitchen knife after they had retired for the night. He then stabbed himself in the abdomen.

Approximately 18 months before this incident defendant injured his back and neck. As a result of the accident, he was unable to work and he became withdrawn and suspicious of others. He became insanely jealous of his wife, thinking that she was "selling her love to other men in order to help him out financially." Eight months prior to the incident he began to hear voices accusing him of being lazy and no good.

His condition was diagnosed on March 2, 1978, by a Dr. Melo as psychotic depression, precipitated by the industrial accident. The degree of his disability appeared to be severe, permanent and stationary. The doctor concluded that defendant was "clearly in need of psychiatric treatment consisting of antidepressive, antipsychotic medications and supportive psychotherapy"; and that he considered psychiatric treatment mandatory. However, treatment would "certainly not restore him fully to his preinjury level of psychological functioning."

In February 1979, defendant was examined by Dr. Sheel at the request of defense counsel. In Dr. Sheel's opinion, defendant, at the time of the stabbing, "did not have the sufficient mental capacity to know and to understand that what he was doing was wrong and in violation of the rights of another.... [that] he was not able to appreciate the criminality of his conduct or to conform his conduct to the requirements of the Law...." Consequently, the doctor concluded that defendant was legally insane at the time of the offense. At the time of the examination, Dr. Sheel did not believe that defendant needed to be hospitalized but that he should continue his treatment with the Mental Health Department. He also stated that since defendant was "only partially recovered from his mental illness" defendant should remain separated from his wife until defendant's physician, Dr. Marrero,[2] felt it was "safe" for her to return to live with him.

Pursuant to the court's order, Dr. Thurston examined defendant on March 9 and 13, 1979. At this time defendant was being medicated with 10 mg. of Haldol and 2 mg. of Cogentin at bedtime. This medication, according to defendant and his wife, had considerably improved defendant's mental state.

Dr. Thurston concluded that defendant was suffering from "schizophrenia, paranoid type," which was "in remission with appropriate medication"; that defendant was "presently in appropriate psychiatric treatment...[was] not now psychotic and appears able to comprehend the realities of his present situation..." and "does not seem to pose a risk to others at present." Dr. Thurston also felt that continued psychiatric treatment could "probably be continued on an outpatient basis."

Dr. Vogeler, Jr. evaluated defendant on March 15, 1979, and also diagnosed defendant as being "schizophrenia, paranoid type"; however he concluded that "at this time he has not fully recovered his sanity nor improved to the extent that he is no longer a menace to the health and safety of others." He recommended that both defendant and his wife receive psychiatric treatment for the next year.

Dr. Field and psychiatric social worker Ramon Rocha informed the court that they believed that with the continuation of the treatment that defendant was receiving, the likelihood of the events repeating them-

---

[2]Defendant began psychiatric treatment in January 1979, with Dr. Marrero.

selves "is very remote." It was their opinion that to commit defendant to a state facility for treatment would "not provide any benefit but would be detrimental and would halt the progress that is being made, and would stop the possibilities of [defendant] being able to rejoin his family." They recommended that it be mandatory that defendant continue his treatment and medication.

On July 11, 1979, Dr. Keating, Jr., of the county mental health services, advised the court that defendant was "not now dangerous to the health and safety of the public, nor to himself [and]...does not currently exhibit psychotic symptoms.... [I]f he continues with treatment, his condition will remain stable and will gradually improve."

On November 27, 1979, Dr. Keating reported that "as long as the patient continues with his treatment regime, he does not constitute a danger to himself or others."

At defendant's sanity hearing on December 10, 1979, Dr. Marrero testified that "with [defendant's] medication and with the treatment that he is receiving that it is a remote possibility that he will become psychotic in view of the fact that this man had a previous psychiatric illness." However, he could not state with any predictive confidence that if the medication and treatment were discontinued that defendant would not have a relapse.

Following this testimony, the court stated that it was "pretty obvious" that "as long as [defendant] receives his treatment and makes his appointments and takes his pills that he is not a danger." However, the court was not convinced that defendant would not be a danger without treatment and medication. The hearing was then continued until February 5 at which time Dr. Thomas vonDedenroth testified that he believed that hospitalization would be "very deleterious" to defendant because it would interrupt his outpatient treatment and his adjustment in the community; that without medication and counseling defendant could revert into a phase where he could be a danger to himself or to others; and that defendant would have to continue medication "for an indefinite period of time...maybe even a lifetime."

Defendant testified that counseling and medication made him feel better and he intended to continue it; that he could now look at razor blades and knives normally and not be afraid.

At the conclusion of the hearing the court stated that it still was "not convinced that the defendant [had] been restored to sanity" nor was it convinced that defendant was no longer a danger to society or to himself. The court did not believe the Legislature intended that medication and treatment should be considered on the issue of present sanity and assumed that the person must not be a present danger when he is not being treated, medicated or counseled. The court then committed defendant to Camarillo State Hospital "for the 90 days mandated by Section 1026 of the Penal Code," stating that it felt it had no discretion to do otherwise; that it did not see "any useful purpose" in so doing and was inclined to think such hospitalization would be "counterproductive"; and that if the Legislature had granted the court discretion in the matter, it would have ordered defendant to continue his treatment on an outpatient basis. The court then stayed execution of the commitment order for 30 days pending an appeal.

Defendant now contends that the test that should have been used for determining whether he had fully recovered his sanity under Penal Code section 1026 should have been the American Law Institute (ALI) test as set forth in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318].[3] He argues that since he was taking medication which brought him back into contact with reality, under the ALI test he would not be found insane.

Following an acquittal of a criminal offense by reason of insanity, the court must determine if the defendant "has fully recovered his sanity."[4]

In *People* v. *Froom* (1980) 108 Cal.App.3d 820, 830 [166 Cal.Rptr. 786] the defendant argued that the trial court, in determining whether defendant had regained his sanity, should have considered whether he was still a danger to himself or others. The court noted that the correct

---

[3]Under the ALI test "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform to the requirements of law."

[4]At the time of defendant's hearing, Penal Code section 1026 read in pertinent part: "... If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private mental health facility approved by the county mental health director, or the court may order the defendant to undergo outpatient treatment as specified in Section 1026.1 [of the Penal Code.]"

standard to be applied by the trial court in determining whether the defendant has regained his sanity under section 1026 had not been the subject of a judicial opinion and stated that it would not consider whether the "danger to himself or others" standard was the proper test because it did not appear from the record that the trial court had in fact applied a different standard. However, the court further stated at pages 831-832: "The purpose of a commitment under Penal Code section 1026 is to protect the defendant and the public during the period necessary to appraise the defendant's present sanity. (*In re Franklin*,...7 Cal.3d [126] at p. 136 [101 Cal.Rptr. 553, 496 P.2d 465].) The Legislature has deemed an institutional examination period necessary for the special class of persons who have committed crimes and then, by a preponderance of the evidence, proven themselves to be insane. (*Id.*, at pp. 144-145.) The standard proposed by defendant would force a trial court prematurely to evaluate the danger posed by an insane defendant to himself and others, without the benefit of the institutional examination period the Legislature has determined to be necessary for that very purpose. (*Ibid.*) Moreover, the court would be forced to make the determination upon evidence which was not intended to aid in the resolution of this issue. (*Ibid.*) [¶] The Supreme Court in *Franklin* specifically held that a defendant is not entitled to a pre-commitment hearing under Penal Code section 1026, but that his right to hearing comes after he has completed the period of his institutional examination. (*Id.*, pp. 145-147.) This is so because by being found to have been insane at the time of a criminal offense the defendant is not merely a potential danger, but has already been judicially determined to have endangered both the public safety and his own as the result of his mental condition. (*Id.*, at p. 147.) Under such circumstances the defendant may properly be committed for a reasonable evaluation period, and the trial court should limit inquiry to whether the defendant has 'fully recovered his sanity.' (Pen. Code, § 1026, subd. (a).) If the defendant has not fully recovered his sanity then the court should proceed under section 1026 and order defendant either committed, or treated as an outpatient if the offense did not involve serious threat or bodily harm to others. If the defendant is ordered committed then after 90 days he is entitled to a hearing to determine whether he remains a danger to himself or others and if not then he is entitled to his release. (Pen. Code, § 1026.2.)"

 Thus, it appears that the appropriate standard should be whether defendant has "*fully* recovered his sanity." If there is any evidence that the defendant is still suffering from a mental illness, the

defendant should be ordered to undergo the appropriate evaluation pursuant to section 1026. In those cases where a defendant has been found guilty of an act which poses a serious threat of harm to another person, the court then *must* direct that the defendant undergo institutional evaluation for 90 days. (*People* v. *Hurt* (1974) 90 Cal.App.3d 974, 976-977 [153 Cal.Rptr. 755].)

 Here, the trial court, after considering numerous psychiatric reports and hearing testimony of two psychiatrists, found both that defendant had not recovered his sanity and that he was still a danger to himself or others. From the evidence presented it is apparent that defendant still needed antipsychotic medication and therapy and that he had not "fully recovered his sanity." Without this medication and therapy there was a possibility that defendant could become dangerous. Since the purpose of a commitment under section 1026 is "to protect the defendant and the public during the period necessary to appraise the defendant's present sanity" (*People* v. *Froom, supra*, at p. 831) psychopharmaceutial restoration of sanity should not be considered a "full" recovery within the meaning of section 1026, subdivision (a) and under such circumstances an institutional examination is necessary to truly evaluate the dangers posed by a defendant.

Defendant also argues that since the county mental health director had already determined that outpatient treatment was preferable to a mandatory commitment, he is eligible for outpatient treatment without first undergoing a mandatory 90-day confinement.

This argument was considered and rejected in *People* v. *Hurt, supra*, 90 Cal.App.3d 974 and *People* v. *Froom, supra*, 108 Cal.App.3d 820, wherein it was held that the language of section 1026 is mandatory. The discretionary power to commit or order immediate outpatient treatment is expressly limited by section 1026 to cases of nonviolent crimes and is not available where the act involves violence.[5] (*People* v.

---

[5]At the time of the hearing herein Penal Code section 1026 (now § 1026, subd. (b)) provided in part: ". . . if the defendant has been found guilty of a felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person, the court *shall* direct that the defendant be confined in a state hospital or other public or private mental health facility approved by the county mental health director for a minimum of 90 days before such defendant may be released on outpatient treatment pursuant to [Section 1026.1 or] subdivision (f) of Section 7375 of the Welfare and Institutions Code." (Stats., 1978, ch. 1291, § 1, p. 4223.) (Italics added.) The 1979 amendment to Penal Code section 1026, in addition to dividing the section into subdivisions, also inserted "Section 1026.1 or" following the words "pursuant to."

*Hurt, supra,* at p. 977; *People* v. *Froom, supra,* at p. 833.) Penal Code section 1026.1 provides only for outpatient treatment as an initial order without a commitment. When the trial court is precluded from entering an initial order for outpatient treatment, section 1026.1 is inapplicable and has no further relevance. (*Froom, supra..*) Clearly, the county mental health director's power to choose a particular disposition is circumscribed by the type of offense the defendant has committed. For those defendants that have been found guilty of certain crimes or of an act posing a serious threat of bodily harm to another and found not to have recovered his sanity, the Legislature mandates that such a defendant be confined in a facility for at least 90 days for evaluation and treatment. (See Analysis of Assem. Bill No. 1229. As amended in Conference (Sept. 12, 1975) Final Rep., Select Com., Appen. 4, p. 72.)

Here there can be no question that the offense of which defendant was acquitted by reason of insanity was extremely violent and posed a serious threat of bodily injury to another. Consequently, neither the court nor the county mental health director had the discretion to release defendant on an outpatient status prior to the 90-day institutional evaluation required by section 1026.

█ Defendant also contends that the 90-day mandatory commitment violates his right to due process and denies him equal protection of the law. These arguments were considered and rejected in the case of *People* v. *Froom, supra,* 108 Cal.App.3d 820, 834 and *In re Franklin, supra,* 7 Cal.3d 126, 142-144, wherein it was held that the California scheme of mandatory commitment violates neither due process nor equal protection of law.

Defendant argues that principles of statutory construction require that the trial court be given the option to order an accused to undergo outpatient treatment. However, this argument has been considered and rejected in *People* v. *Hurt, supra,* 90 Cal.App.3d 974, 977, wherein the court stated, "... a defendant found not guilty of assault by means of force by reason of insanity and who has not regained his sanity *shall* be confined in a state hospital for a minimum of 90 days before he can be released on outpatient treatment. It is a well established rule of statutory construction that the word 'shall' connotes mandatory action. [Citation.] The discretionary power to commit or order outpatient treatment is thus expressly limited to cases of nonviolent crimes and is not available where the act involves violence." (Italics in original.)

On March 29, 1979, three days after the *Hurt* decision was filed, Senate Bill No. 1022 was introduced as an emergency measure (See Stats. 1979, ch. 1114) amending section 1026 to provide that if a defendant has been found guilty of certain violent offenses, "the court *shall* direct that the defendant be confined ... for a minimum of 90 days ...." (Italics added.) In *Froom*, the court noted the amendment and held that even if section 1026 were interpreted to be ambiguous, the ambiguity would have to be resolved against defendant, stating, "An amendment enacted soon after controversies arise as to the interpretation of the original act may be regarded as a legislative interpretation of the original act. [Citation.] The trial court correctly determined that it had no discretion to place defendant on outpatient treatment." (*People* v. *Froom, supra*, at p. 834.)

Defendant, in his supplemental opening brief also contends that Assembly Bill No. 2751, effective January 1, 1981, will allow defendants, like himself, to be placed on an outpatient status. However, section 1026, subdivision (a) still will provide that "[i]f the verdict or finding be that the defendant was insane at the time the offense was committed, the court, unless it shall appear to the court that the sanity of the defendant *has been recovered fully*, shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility approved by the county mental health director, *or* the court may order the defendant placed on outpatient status pursuant to Title 15 (commencing with Section 1600) of Part 2."

Section 1601 of Assembly Bill No. 2751 provides: "(b) In the case of any person charged with, convicted of, or acquitted by reason of insanity of any misdemeanor or any felony *other than those described in subdivision (a)*, outpatient status under this title may be granted by the court prior to actual confinement in a state hospital or other treatment facility under the provision of law specified in section 1600." (Italics added.)

Under section 1603, before a person subject to the provisions of section 1601, subdivision (a) may be placed on outpatient status the following conditions must be satisfied. (a) The director of the state hospital or other treatment facility must advise the committing court that the defendant is no longer likely to be a danger to the health and safety of others while on outpatient status, and that the patient will benefit from such status; (b) The county mental health director advises the

court that the defendant will benefit from outpatient status and identifies an appropriate program of supervision and treatment; (c) The court must specifically approve the recommendation and plan for outpatient status.

Thus, it is clear that under Assembly Bill No. 2751 at least 90 days is also required in those cases where a defendant has been found not guilty by reason of insanity of certain violent offenses.

Defendant also contends that since Penal Code section 245, subdivision (a) is not one of the specifically enumerated offenses set forth in section 1026, under the doctrine of *ejusdem generis*, section 1026 does not apply to him. However, section 1026, subdivision (b) also applies when "an act which poses a serious threat of bodily harm to another person" has been committed. Here, defendant stabbed his wife several times with a kitchen knife before stabbing himself in the stomach. Clearly, his behavior fell within this category and contrary to defendant's contention, there is no need to remand this case to the trial court for a finding of that issue.

█ Defendant's contention that this court has the inherent equity power based upon the individual facts in this case to mitigate the harshness of section 1026 must be rejected. As Chief Justice Bird stated in her concurring opinion in *People v. Caudillo* (1978) 21 Cal.3d 562, 589-590 [146 Cal.Rptr. 859, 580 P.2d 274]: "... This court must give full weight to that intent, whatever our personal views concerning this most serious offense. [¶] The offenses committed by appellant on the victim in this case were 'outrageous, shocking and despicable,' as the majority state.... [¶] However, personal repugnance toward these crimes cannot be a legitimate basis for rewriting the statute as it was adopted by the Legislature. It is precisely because emotions are so easily called into play in such situations that extra precaution must be taken so that this court follows legislative intent and not our own predilictions [*sic*] or beliefs. This court has no choice in this matter. It must accept the Legislature's intent despite any personal feelings to the contrary. This court must accord the words of statutes their plain meaning and has done so in this case...."

Here, the legislative intent requiring a 90-day commitment prior to undergoing outpatient treatment is clear and this court must accept the Legislature's intent.

Furthermore, contrary to defendant's argument, a mandatory 90-day commitment in a case such as this cannot be considered "a harsh result." The act committed was extremely violent, and the 90-day commitment is necessary "to protect the defendant and the public during the period necessary to appraise the defendant's present sanity." A court should not be forced to evaluate defendant's condition without the benefit of the institutional examination period the Legislature has determined to be necessary for that very purpose. (*People* v. *Froom, supra,* at pp. 831-832.)

Clearly, the court properly committed defendant to the Department of Health for placement at Camarillo State Hospital for a period of 90 days.

The order is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied January 7, 1981, and appellant's petition for a hearing by the Supreme Court was denied February 18, 1981.