UNITED STATES, Appellant,

v.

Mark MENDELSOHN, Appellee.

No. 80–1186.

District of Columbia Court of Appeals.

Argued Dec. 2, 1981.

Decided March 29, 1982.

Pamela B. Stuart, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry, Michael W. Farrell, and William J. Bowman, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Lawrence H. Schwartz, Washington, D. C., with whom Barbara Kammerman, Washington, D. C., was on the brief, for appellee.

Before NEWMAN, Chief Judge, and MACK and PRYOR, Associate Judges.

NEWMAN, Chief Judge:

Appellee was charged by information with destruction of property (felony), D.C. Code 1981, § 22–403, and attempted second-degree burglary, id., §§ 22–103, –1801. In a bench trial on stipulated facts, appellee was found not guilty by reason of insanity. In light of what is termed "an extraordinary set of circumstances," the trial court ordered appellee committed under D.C.Code 1981, § 24–301(d)(1), and then immediately released him unconditionally under id., § 24–301(d)(2).[1] The government appeals from the trial court's release determination on the ground that the court acted without authority. As the government interprets § 24–301(d), the trial court—once it found appellee to be not guilty by reason of insanity—had no choice but to direct an actual

---

1. Section 24–301(d)(1) provides:

If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e) of this section.

Section 24–301(d)(2) provides in pertinent part:

A person confined pursuant to paragraph (1) shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody. * * * Within ten days from the date the hearing was begun, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto. The person confined shall have the burden of proof. If the court finds by a preponderance of the evidence that the person confined is entitled to his release from custody, either conditional or unconditional, the court shall enter such order as may appear appropriate.

commitment to "a hospital for the mentally ill" (presumably St. Elizabeths) with eligibility for release to be determined at a subsequent hearing. We agree. Accordingly, we reverse that portion of the trial court's order directing that appellee be released.[2]

## I

On January 22, 1980, appellee entered a home in northwest Washington without permission. In what was later diagnosed as an acute psychotic episode, appellee committed bizarre acts that were highly destructive in nature, both to property in the home and to himself as well. Following his arrest, he was admitted to the Psychiatric Institute, where he was treated by Dr. Alen J. Salerian. His continued inpatient treatment under Dr. Salerian became a condition of appellee's pretrial release. On March 6, 1980, the court modified appellee's release conditions to allow his discharge from the Psychiatric Institute provided that he receive outpatient treatment from Dr. Eric Bergman.

Dr. Bergman, who had been treating appellee since March 11, testified that on January 22 appellee had been suffering from "[m]anic depressive illness, manic type." In Dr. Bergman's opinion, this mental illness was responsible for the actions that gave rise to the criminal charges. Bergman felt that appellee "was delusional at that point, he had delusions that he was the Messiah, delusions of grandeur, and also a couple of paranoid delusions about being pursued by different evil kinds of forces, and those can help account for what he did."

Dr. Bergman's diagnosis differed somewhat from that of Dr. Kevin Donohue of the Forensic Psychiatry Division of the Department of Human Resources of the District of Columbia.[3] According to his report on the results of his examination of appellee, Dr. Donohue found appellee's behavior at the time of his criminal conduct to be "entirely consistent with a severe psychotic disorder, most probably schizophrenia, schizo-affective type, characterized by delusional thought processes, increased motor activity, grandiose magical thinking, as well as destructive behavior." He agreed with Dr. Bergman that appellee's mental illness was responsible for his actions on January 22.[4]

Doctors Bergman and Donohue also were in agreement that appellee's treatment

---

2. We have jurisdiction to review release determinations in cases involving criminal commitment under D.C.Code 1981, § 24–301(d)(3), which provides that "[a]n appeal may be taken from an order entered under paragraph (2) [§ 24–301(d)(2)] to the court having jurisdiction to review final judgments of the court entering the order." *See* D.C.Code 1981, § 11–721(a). Since this appeal does not arise in the context of a civil commitment proceeding, our decision in *In re Lomax*, D.C.App., 386 A.2d 1185 (1978) (en banc), which held that the petitioner in an involuntary commitment proceeding has no right of appeal from a release determination in favor of the patient, has no applicability here.

The defendant's right to be free from double jeopardy for a single offense does not bar this appeal. The appeal concerns only the commitment and release orders; it seeks neither to reopen the determination on the merits, *i.e.*, the acquittal by reason of insanity, *see United States v. Scott*, 437 U.S. 82, 97–98, 98 S.Ct. 2187, 2197–2198, 57 L.Ed.2d 65 (1978); *United States v. Tyler*, D.C.App., 392 A.2d 511 (1978) (en banc), nor to increase a criminal penalty, *see North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

3. On May 29, 1980, the trial court ordered a psychiatric examination of appellee to determine whether, at the time of the offense, appellee suffered from a mental disease or defect and whether his actions were a product of that mental disease or defect. Dr. Donohue's report followed on June 30.

4. At trial, Dr. Donohue explained why his diagnosis differed from that of Dr. Bergman:

Well, manic depressive illness [is] primarily a disorder of mood. That means that there are periods of feelings of euphoria, assuming that the particular phase of the illness is in the excited state. It can be always a depression, in the face of the illness, is operating in the other direction. If it were a manic attack, or a manic episode, I would expect that the first symptom would be a change in mood, rather than a change in thinking.

My conversation with [appellee], the first symptom that presented itself appeared to be changes in his thinking that took place one week prior to the episode. Specifically, feelings that or preoccupation with some sort of a synthesis of head and heart, feeling at one particular point that an invisible helmet was

with lithium carbonate (begun during his stay at the Psychiatric Institute) had been successful in treating his illness, which Dr. Donohue found to be in "excellent remission." According to Dr. Bergman, lithium has been found both to reduce the frequency of psychotic episodes such as the one appellee experienced and to reduce the severity of an episode, if one does recur. Dr. Bergman stated that lithium controls the symptoms of an illness, but is not a cure for the illness itself. Should appellee stop taking the medication, he might have another episode of the type he experienced on January 22. Dr. Donohue testified similarly, noting that he saw no danger of another episode as long as appellee continued to take lithium.

Over government objection, both doctors were allowed to testify as to appellee's mental state at the time of trial. Dr. Bergman testified that appellee was not "a danger to himself or others," but noted that the validity of his opinion would rest on continued lithium maintenance. Dr. Donohue concurred that appellee is "not actively suffering from mental disease at this particular time, and therefore would not be a danger to himself or others as a result of a disease." He, too, noted that his opinion could change if appellee stopped taking his medication.

Appellee, who is a clinical psychologist, testified that he had never before experienced a psychotic episode like that which occurred on January 22. He attributed its occurrence to his inability to resolve three stress factors in his life: severe financial strain, the nature of his work (treating psychotic families), and a general disap-

pointment with his post-doctoral fellowship program. About a week before the offense with which he was charged, appellee became aware of an "acute kind of sensitivity to stimuli around [him], such that things became kind of painful at times." The evening before the episode, appellee's wife left him, taking their children. His destructive activities on the following day were accompanied by feelings of hurt, anger, and rage.

Appellee testified that most of his problems had been resolved since then. He and his family were back together, his work with psychotic families was concluded, and his new position at the Alexandria Community Mental Health Center was more satisfying to him professionally. He remained in therapy with Dr. Bergman and expected to continue the treatment for several years. The lithium carbonate, which he had taken faithfully since his hospitalization, had been helpful. He had no objection to continuing the medication and other therapy.

At the conclusion of the testimony, the trial court found appellee not guilty by reason of insanity. Counsel for appellee then asked the court to make a determination, based on appellee's then-current mental state, that appellee was eligible for release under § 24–301(d)(2) of the Code.[5] The government took the position that the trial court had no discretion to release appellee immediately, since § 24–301(d)(1) requires automatic commitment. The trial court continued the matter in order to study memoranda filed by the parties and determine whether the procedure requested by appellee would be proper. In the meantime, the court continued appellee's release

placed on his head, and some sort of a band would be placed on his heart, so I think that this is a disorder of thought . . . rather than a disorder of mood.

5. In effect, the court was asked to conduct a so-called *Bolton* hearing, *see Bolton v. Harris*, 130 U.S.App.D.C. 1, 10–11, 395 F.2d 642, 651–52 (1968), to determine whether there was any justification for appellee's "continued" commitment. The court's finding of not guilty by reason of insanity would have justified appel-

lee's automatic post-verdict commitment only "for the period required to determine present mental condition." *Id.* at 10, 395 F.2d at 651. After *Bolton*, D.C.Code 1981, § 24–301(d)(2), was added to require the court to hold a hearing, unless waived, for the purpose of determining a criminal acquittee's present mental state, within 50 days of his confinement. *See United States v. Brawner*, 153 U.S.App.D.C. 1, 29, 471 F.2d 969, 997 (1972) (en banc).

conditions pending its final ruling on whether appellee would be committed.

Six-and-a-half weeks later, the trial court rendered its decision. Having found appellee not guilty by reason of insanity, the court ordered appellee committed pursuant to § 24–301(d)(1). The court continued:

Further, the defendant having been committed, the Court finds by a clear preponderance of the evidence that he has recovered his sanity and will not in the reasonable future be a danger to himself or others. Therefore, pursuant to D.C. Code Section 24–301(d)(2) 1973, the defendant is entitled, and is hereby

ORDERED, to be unconditionally released from custody.

The trial court, having concluded that § 24–301(d)(1) authorized it to follow this procedure, based its determination in part on the testimony of Doctors Bergman and Donohue that appellee's mental illness was in remission and that he no longer presented a danger to himself or others. The court noted that appellee's case involved "an extraordinary set of circumstances," including appellee's period of confinement at the Psychiatric Institute and his subsequent recovery, as well as his apparent personal and professional adjustment. In the court's words, "It is clear that the defendant has diligently pursued all opportunities for recovery and rehabilitation. Indeed everything points to the conclusion that the defendant is pursuing the best path to recovery available to him." In light of these facts and its conclusions based thereon, the court decided that a period of confinement would be unnecessary and punitive, and ordered appellee's unconditional release. This appeal followed.

## II

■ Upon the trial court's finding that appellee was not guilty by reason of insanity, appellee became subject to the legislative provision that "any person" who successfully raises an insanity defense "shall be committed to a hospital for the mentally ill until such time as he is eligible for release." D.C.Code 1981, § 24–301(d)(1); see note 1, supra. This commitment provision and its predecessor[6] have been termed both "mandatory," Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962); Bethea v. United States, D.C.App., 365 A.2d 64, 92 and n.62 (1975), cert. denied, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); United States v. Shorter, D.C.App., 343 A.2d 569, 572 (1975); United States v. Brawner, 153 U.S.App.D.C. 1, 29, 471 F.2d 969, 997 (1972) (en banc), and "automatic," Jones v. United States, D.C.App., 432 A.2d 364, 374 (1981) (en banc); Frendak v. United States, D.C.App., 408 A.2d 364, 370 n.5 (1979); Bolton v. Harris, 130 U.S.App.D.C. 1, 7, 395 F.2d 642, 648 (1968). Appellee contends, however, that the phrase "until such time as he is eligible for release" must be interpreted as meaning that no minimum period of commitment is required. In other words, he argues, automatic commitment under the statute is mandatory until such time as one is found eligible for release; if such eligibility can be established at the time of the verdict, no actual commitment is required.

The Supreme Court has stated that the predecessor to the current version of § 24–301(d) gave the trial court no discretion with respect to the automatic commitment of a criminal acquittee. "By its plain terms it directs confinement in a mental hospital of any criminal defendant in the District of Columbia who is 'acquitted solely on the ground' that his offense was committed while he was mentally irresponsible, and forecloses the trial judge from exercising any discretion in this regard." Lynch v.

6. Section 24–301(d) was amended by the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No.91–358, tit. II, § 207, 84 Stat. 601. Cases decided prior to this amendment, including Lynch and Bolton, construed D.C.Code 1967, § 24–301(d), which does not contain the words "until such time as he is eligible for release."

*Overholser, supra*, 369 U.S. at 708, 82 S.Ct. at 1066.[7]

In its analysis of the statute, the Supreme Court considered a report to Congress that had recommended a mandatory commitment provision for the District of Columbia, subsequently enacted as § 24–301(d). In the report, the Committee on Mental Disorder as a Criminal Defense[8] stated why it preferred a mandatory provision to a discretionary one:

[T]he Committee is of the opinion that the public is entitled to know that, in every case where a person has committed a crime as a result of a mental disease or defect, such person *shall* be given a period of hospitalization and treatment to guard against imminent recurrence of some criminal act by that person.

The Committee believes that a mandatory commitment statute would add much to the public's peace of mind, and to the public safety, without impairing the rights of the accused. [Where the accused has pleaded insanity as a defense to a crime,] and the jury has found that the defendant was, in fact, insane at the time the crime was committed, it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and the accused should automatically be confined for treatment until it can be shown that he has recovered. S.Rep.No.1170, 84th Cong., 1st Sess. 13 (1955); H.R.Rep.No. 892, 84th Cong., 1st Sess. 13 (1955). [*Id.* at 716–17, 82 S.Ct. at 1070–71 (bracketed portion was italicized by the Supreme Court in *Lynch*).]

The D.C. Circuit interpreted the section to require some period of observation before a release hearing.

Congress did not see fit to provide for a hearing following immediately upon the verdict to determine the defendant's *then* mental condition. Perhaps Congress took into account the inescapable fact that such a hearing would be meaningless until trained medical experts had a reasonable opportunity to observe and examine the subject and report their findings. Hence some time gap between the verdict and the appraisal of the defendant's then existing mental condition is unavoidable under any scheme which would provide adequate safeguards. [*Ragsdale v. Overholser*, 108 U.S.App.D.C. 308, 313, 281 F.2d 943, 948 (1960).]

■ Appellee's argument for a different result rests on statutory language (italicized here) that was added in 1970.

If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill *until such time as he is eligible for release* pursuant to this subsection or subsection (e). [D.C.Code 1981, § 24–301(d)(1).]

Therefore, cases antedating the 1970 amendments, such as *Lynch* and *Ragsdale*, are not dispositive. However, we find no evidence that the language relied on by appellee was intended to provide a means of negating the apparently mandatory commitment provision that immediately precedes it. Such evidence as exists is to the contrary, *i.e.*, that commitment was meant to remain automatic, and that the release hearing would follow some period of confinement, however short. The House committee report on the 1970 amendment char-

---

**7.** The Court distinguished this type of statute from a "discretionary commitment statute [which] presumably leaves the trial judge or jury free to find the accused presently sane and thus entitled to full liberty." *Id.* at 709 n.4, 82 S.Ct. at 1066 n.4. *See also id.* at 725–28, 82 S.Ct. at 1074–76 (Clark, J., dissenting) (comparison of mandatory with discretionary commitment in various states).

**8.** The Committee was established by the Council on Law Enforcement in the District of Columbia to inquire into "the substantive and procedural law of the District of Columbia bearing on mental disorder as a defense in a criminal prosecution." *Id.* at 715–16, 82 S.Ct. at 1069–70, quoting S.Rep.No.1170, 84th Cong., 1st Sess. 1 (1955); H.R.Rep.No.892, 84th Cong., 1st Sess. 1 (1955).

acterizes post-acquittal commitment as "mandatory" and "automatic."

Once a defendant's insanity is established by a preponderance of the evidence and he is acquitted of the charge, there is no need for the post-trial hearing required by *Bolton.* Subsection (d) therefore, has been amended to provide for the *mandatory* commitment of such a defendant without a hearing until such time as he is either certified by the hospital and found by the court to be recovered or establishes his recovery in court after filing the appropriate motion.

In accordance with *Lynch v. Overholser, supra,* this *automatic* commitment applies only when the defendant himself has raised the defense of insanity. [*H.R. Rep.No.*907, 91st Cong., 2d Sess. 74 (1970) (emphasis added).]

In justifying mandatory commitment, the report quotes the portion of the 1955 legislative record relied on in the *Lynch* case and reprinted above. We conclude that Congress intended there to be a separate release hearing after commitment and evaluation of the acquittee in a hospital setting.[9]

Appellee argues forcefully that inpatient confinement is unnecessary to fulfilling the statutory functions of psychiatric evaluation and treatment. He has already undergone diagnosis of his present condition, both by his own therapists and government physicians, including seven weeks of evaluation and treatment as an inpatient. He is already engaged in the treatment regimen that the medical experts agree is best suited to his needs, which does not require hospitalization.

Moreover, appellee contends that commitment to St. Elizabeths will impose considerable hardship and *impede* rather than promote his therapeutic progress. Of course, involuntary confinement represents, in and of itself, a major hardship implicating constitutionally-protected personal liberty.[10] Furthermore, appellee's testimony indicates that commitment will prevent him from seeing his private patients and interfere with his work at the Alexandria Community Mental Health Center.[11] The fact that some of his colleagues at the clinic also work part time at St. Elizabeths may also be significant. Appellee contends that, if committed, his psychotic episode and subse-

**9.** Courts of other jurisdictions have reached similar conclusions with regard to their own laws governing confinement of acquittees. *See, e.g., People v. Froom,* 108 Cal.App.3d 820, 166 Cal.Rptr. 786 (Ct.App.1980); *People v. De Anda,* 114 Cal.App.3d 480, 170 Cal.Rptr. 830 (Ct.App.1980), *cert. denied,* 451 U.S. 990, 101 S.Ct. 2329, 68 L.Ed.2d 849 (1981); *Application of Jones,* 228 Kan. 90, 612 P.2d 1211 (1980). However, such precedents are of limited force in the instant case, since the statutes they construe typically differ significantly from our own. The California cases apply a statute that explicitly requires a *minimum* commitment of 90 days unless the acquittee is "fully recovered." *See Froom, supra; De Anda, supra.* The Kansas statute construed in *Jones* does not provide that confinement is to last only "until such time as [the acquittee] is ready for release," and the person confined apparently has no right to a hearing until after a full year of confinement. *See Jones, supra.*

**10.** Appellee does not contend that application of a mandatory commitment statute to the facts of his case would be unconstitutional, and we refuse so to hold. However, we also decline

to pretermit the possibility that some set of facts not now before us would require constitutional relief. If, for example, a person were acquitted by reason of insanity several years after the crime, and it was shown that he had since lived a normal and faultless life, neither inflicting nor threatening harm for five years, automatic confinement might pose a serious constitutional question.

The U. S. Court of Appeals for the District of Columbia Circuit recently held, on equal protection grounds, that the District's mandatory commitment statute may not be applied to defendants accused of federal crimes. *United States v. Cohen,* 674 F.2d 8 (D.C.Cir. No. 81–1036, March 5, 1982). The holding does not apply to those who, like Mendelsohn, are accused of crimes under the D.C.Code. As in the present case, the issue of a possible due process violation was not presented, and the court expressly declined to address it. *Id.,* at 9.

**11.** At the time of the hearing, appellee worked part time at the center and was scheduled to begin full time work on September 1, 1980.

quent commitment would inevitably become known to his peers, which would impede his professional advancement.

We are not unmindful of or insensitive to these potential problems. However, we are confident that their effects can be minimized if the responsible hospital officials give due respect to appellee's interests in freedom and in not undermining the considerable readjustment he has achieved as an outpatient. The statutory fifty day period authorized for pre-hearing evaluation is a maximum, not a minimum. Temporary confinement before a hearing is constitutionally acceptable "for the period required to determine present mental condition," but "[o]nce the examination period is over . . . there is no rational basis for denying a hearing." *Bolton v. Harris, supra* 130 U.S. App.D.C. at 10, 395 F.2d at 651. Moreover, retention of appellee as an inpatient after it is clear that outpatient treatment is preferable would contravene the policy underlying the requirement that insanity acquittees receive the least restrictive alternative treatment. *See Ashe v. Robinson,* 146 U.S.App. D.C. 220, 450 F.2d 681 (1971); *Covington v. Harris,* 136 U.S.App.D.C. 35, 419 F.2d 617 (1969).

In light of these considerations, it behooves the hospital staff to recommend release as soon as it is apparent to them that the patient fails to meet the criterion of dangerousness as a result of present mental illness. The Kansas Supreme Court's observation about mandatory commitment of insanity acquittees in that state is equally applicable in the District of Columbia. "Inherent in [Kansas's mandatory commitment statute] is that upon commitment, the state security hospital should with all due speed evaluate the petitioner's present condition,

needs and propensity for dangerousness." [12] Moreover, the hospital will not start at ground zero, as it must when there is no previous evaluation of the acquittee's post-treatment condition. The diagnostic and treatment data already available gives the clinicians a considerable head start.[13] If the medical evidence presented below is accurate—and we have no basis for doubting it—the necessary period will very likely be brief.[14]

We conclude that § 24–301(d) left the trial court without discretion to release appellee before the commitment order was put into effect. Accordingly, we remand with instructions that he be committed for evaluation and treatment.

*Reversed and remanded.*

MACK, Associate Judge, dissenting:

In my view, the trial court's order constitutes compliance with the provisions of D.C. Code 1973, § 24–301(d)(1) and (2) [now D.C. Code 1981, § 24–301(d)(1) and (2)(A) and (B)]. The court, in acquitting appellee by reason of insanity, met the "mandatory" or "automatic" requirement of subsection (1) by ordering appellee's commitment. But the court also found, pursuant to subsection (2), by a clear preponderance of the evidence before it, that appellee was now sane, "will not in the reasonable future be a danger to himself or others" (see *id.* 24–301(e)) and was entitled to release. Its findings are supported by ample evidence, including the representations of both defense and government experts, submitted after extensive diagnoses and treatment (both voluntary and imposed as a condition of pretrial release).

Unless we are prepared to say that the findings of the trial court are clearly erro-

---

**12.** *Application of Jones, supra* 228 Kan. at 112, 612 P.2d at 1230 n.9.

**13.** "The extensive psychiatric treatment received by the petitioner should provide valuable data for the state security hospital in its evaluation of the petitioner." *Id.*

**14.** The question whether inexcusable delay by the hospital after it is apparent that further

commitment is unnecessary—even though the 50 day statutory maximum is not exceeded— would merit constitutional relief is not now before us. For present purposes, it suffices to recognize that the facts at hand do not render unconstitutional *any* confinement whatsoever, no matter how brief.

**1318**

neous, I do not see the logic or the justification for the action we take today. We are holding that a sane man who has been released into the community for two years and who is now leading a productive life, must be confined in a mental hospital for the sole purpose of triggering his right to seek subsequent release. *See id.* § 24–301(d)(2). As the trial court noted, this confinement will not advance either one of the two-fold purposes of the statute "to provide ... treatment and to protect the public." *See United States v. Shorter*, D.C. App., 343 A.2d 569, 572 (1975). We are courting the proverbial "exalt[ation of] form over substance."

I respectfully dissent.