[Crim. No. 10369. Third Dist. July 31, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT J. FROOM, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Michele Vague, Tom Lundy and Kathleen Kahn, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and Nancy Sweet, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DeCRISTOFORO, J.*—Defendant Robert J. Froom appeals from an order committing him for a minimum period of 90 days to the state hospital or other mental institution, after a jury first found him guilty of violation of Penal Code section 246 (discharging a firearm at an inhabited dwelling), and then not guilty by reason of insanity (Pen. Code, § 1026). Defendant contends that the instructions during the guilt phase of his trial, on diminished capacity, unconsciousness and insanity were erroneous and confusing to the jury; that the trial court utilized an incorrect standard in determining whether he had regained his sanity; that former Penal Code section 1026 did not require the trial court to order a minimum commitment period of 90 days; and that if that section did so require then it violates due process of law. We reject each of these contentions and affirm the order of commitment.

I

The evidence concerning the offense was relatively simple. During July 1978, Tracy Borhani and her cousin Ronald Hyde were staying with their grandfather, Gerald Hyde, in his mobilehome in the City of Davis. Ronald Hyde became acquainted with defendant and did some work for a friend of defendant. On July 22, 1978, Ronald and Tracy encountered defendant at the swimming pool at the mobilehome court. Defendant called Ronald over to where he was and accused Ronald of taking a radio and some drugs from his home. Ronald denied doing so and defendant showed him a knife and stated that he could "throw this backwards and hit things." Defendant also stated that if he did not get his merchandise back he would start "taking out" or "blowing out" trailers one by one. Ronald and Tracy then left the pool area.

That same night Tracy went on a movie date and did not return until about 3 a.m. As her date drove her home at that hour she observed defendant walking along the road about 20 feet from Gerald Hyde's mobilehome. Tracy entered the mobilehome and went into the bath-

---

*Assigned by the Chairperson of the Judicial Council.

room and then heard what sounded like shots or firecrackers. Gerald Hyde told Tracy it was just firecrackers, and they went to bed.

The following morning Gerald Hyde discovered holes in two windows and corresponding holes in two walls. Officers called to the scene recovered two spent bullets from the walls of the mobilehome. That day a search warrant was served on the mobilehome where defendant was staying. Officers found five empty shell casings from a .38 caliber weapon, one live round, and a .38 caliber Colt revolver. A criminologist testified that the pistol had been fired and that the spent bullets recovered from the trailer were consistent with a test bullet fired from the revolver, although positive identification could not be made due to the damaged condition of the recovered bullets.

The defense did not attempt to introduce evidence to prove that defendant had not fired the shots into the Hyde mobilehome on July 23, but rather attempted to raise a reasonable doubt that he had done so with the malice and willfulness required by Penal Code section 246. Jay Gray, defendant's public defender, testified he met defendant in early August 1978, at which time defendant was thin and haggard, and looked much older than his reported age of 26. Gray had difficulty communicating with defendant and did not believe that defendant understood his questions.

Michael Galatioto, who had known defendant since they were in third grade and with whom defendant was staying at the time of the offense, testified that defendant is normally quiet and considerate and what would be called a "nice guy," but that on three occasions he had suffered mental breakdowns. During these times defendant would become argumentative and defensive, was generally difficult to get along with, would lose weight and sleep very little, and it was like defendant was "going a hundred miles an hour." Galatioto further said that when defendant came to stay with him before the incident in question, defendant was exhibiting the same symptons he had on the prior two occasions of mental breakdowns. Medical treatment had helped on those occasions and Michael suggested that defendant see a doctor, but he refused. Michael also described some of the bizarre activities defendant would engage in during the periods of his breakdowns. After the shooting incident, defendant went to the San Francisco area, and Michael arranged for him to return and turn himself in to the police. Michael subsequently arranged for defendant to get medical attention.

Several months before the offense, Peggy Raikes, a graduate student at the University of California at Davis, had met defendant at the MGM Grand Casino in Reno, where they both worked. She testified that when she met defendant in May 1978, he was well liked, an excellent bartender, and impeccably dressed. Defendant began to deteriorate and by the time he quit his job several months later, his posture was poor, his dress was shabby ("like a bum in the woods"), he did not shave or bathe regularly, and Peggy felt that it was real sad and pathetic. She said defendant's personality also changed, so that he went from a rather shy, easy-going guy to a real jerk.

Dr. Glenn Hakanson, a private practitioner in psychiatry, met defendant at his office when Michael Galatioto brought him there on August 3, 1978, almost two weeks after the incident. Dr. Hakanson treated defendant with an antipsychotic medication, and eventually had defendant hospitalized, from August 22 to August 24. The doctor diagnosed defendant as psychotic, either paranoid schizophrenic or manic depressive. He considered defendant's history, including a consultation with the psychiatrist that treated defendant during a previous episode. He believed that at the time of the shooting defendant was not capable of forming the intent deliberately to shoot at a house and that he did not know what he was doing.

Defendant did not testify.

The jury found defendant guilty of shooting at an inhabited building in violation of Penal Code section 246. The same jury then heard evidence on defendant's plea of not guilty by reason of insanity, including (by stipulation) the evidence introduced during the guilt phase.

During the sanity phase, defendant again did not testify, but presented the testimony of three psychiatrists, Doctors Thompson, Hakanson, and Hudnall. They agreed that defendant was suffering from a psychosis, but their opinions differed as to whether it was paranoid schizophrenia or manic depressive. The doctors also agreed that, due to his illness, defendant's capacity to conform his conduct to the requirements of the law was substantially impaired. The jury found defendant to have been insane at the time of the offense.

Upon return of that verdict, the trial court stated for the record that it found that the offense which defendant was found to have committed

was one which posed a serious threat of bodily harm to other people and that under Penal Code section 1026 defendant must be committed to a mental health facility for a minimum period of 90 days. Defense counsel made an offer of proof that the treating and examining doctors would testify that they did not require a 90-day commitment to evaluate and treat defendant, and that outpatient care would be adequate. Counsel argued that a 90-day commitment was unnecessary in defendant's case. The trial court rejected this argument, indicating that it believed that it had no choice or discretion in the matter. The court ordered that defendant be committed for a 90-day period, but stayed execution of the order until defendant could either apply for a writ or have this appeal determined.

## II

Defendant contends that the trial court erred in instructing the jury during the guilt phase of the trial. The first instruction to which defendant objects is the portion of CALJIC No. 3.34 which provides: "[For the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime described in the information.]" The CALJIC use note to No. 3.34 states that the above quoted portion of the instruction should not be given in a trial involving a specific intent crime if there is evidence of diminished capacity. Defendant argues that this was a case involving diminished capacity, and thus the instruction was error.

The People answer that a violation of Penal Code section 246 is a general intent crime and that defendant was thus not entitled to raise the defense of diminished capacity. We must agree. The Supreme Court has established that diminished capacity is not a defense to a general intent crime. (See *People* v. *Gauze* (1975) 15 Cal.3d 709, 718-719 [125 Cal.Rptr. 773, 542 P.2d 1365]; *People* v. *Noah* (1971) 5 Cal.3d 469, 477-478 [96 Cal.Rptr. 441, 487 P.2d 1009]; *People* v. *Hood* (1969) 1 Cal.3d 444, 458 [82 Cal.Rptr. 618, 462 P.2d 370].) Shooting at an inhabited dwelling is such a general intent crime. (See *People* v. *Wetmore* (1978) 22 Cal.3d 318, 327-328, fn. 9 [149 Cal.Rptr. 265, 583 P.2d 1308]; *People* v. *Hoover* (1974) 12 Cal.3d 875, 882, fn. 5 [117 Cal.Rptr. 672, 528 P.2d 760]; *People* v. *Bohmer* (1975) 46 Cal.App.3d 185, 190-191 [120 Cal.Rptr. 136].) Since defendant was not entitled to an acquittal due to diminished capacity, he may not complain that the court's instructions deprived him of such a defense.

In any event, even assuming error in giving the instruction, we would not hold that it was prejudicial. *People* v. *Wingo* (1973) 34 Cal.App.3d 974 [121 Cal.Rptr. 97, 534 P.2d 1001], was a case in which the trial court erroneously gave the above quoted portion of CALJIC No. 3.34 in a trial of a specific intent crime. The court noted that the instruction had the potential of being confusing but stated "Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to the other instructions and in light of the instructions as a whole. [Citations.] Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court. [Citations.]" (*Id.*, at p. 979.)

After the jury had begun deliberations the foreperson sent a note to the trial judge requesting a clarification of the jury's duty to consider the defendant of sound mind. After rereading the second portion of CALJIC No. 3.34, the trial court explained: "Now, that means that you cannot, as you discuss his guilt or innocence in the guilt phase, bring into the case in any way the fact that he might or might not be legally insane. I haven't given you any definition on legal insanity at all. And that includes temporary insanity. So, you don't consider that in this phase of the case. [¶] But in this phase of the case, the Legislature, in defining the crime charged, has inserted the words that the act must be done maliciously and willfully. So, you can consider his mental state in deciding whether or not the evidence shows to moral certainty and beyond a reasonable doubt that he did the acts, if you find he did the acts, willfully and maliciously." The court further instructed: "So, 'when a defendant is charged with a crime which requires that a certain mental state be established in order to constitute the crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the mental state essential to constitute the crime with which he's charged.' [¶] And as I indicated, the mental state under the statute is willfully and maliciously. 'Thus, if from all the evidence you have a reasonable doubt whether the defendant was capable of forming such mental state, you must give the defendant the benefit of that doubt and find that he did not have such mental state.'" The latter portion of these instructions accurately state the law of diminished capacity, so that, in the abstract, the jury was not

misinformed on that subject. (See *People* v. *Wetmore, supra*, 22 Cal.3d 318.) However, as we have already noted, defendant was not entitled to that defense for this crime, so the error in giving these instructions was not to his detriment and he was not prejudiced thereby and so may not complain thereof. The first portion of the trial court's extemporization was entirely correct because the judge was merely reciting the well-established law that insanity is a defense which is raised by a separate plea and is decided in a separate trial from that of guilt. (Pen. Code, §§ 1016, subd. 6, 1017, subd. 5; *People* v. *Wetmore, supra.*)

Defendant also argues error in instructing the jury on unconsciousness as a defense, and in failing to reinstruct the jury on unconsciousness when the jury sought additional instructions on the presumption of defendant's sound mind. The instruction given by the court, CALJIC No. 4.30 (3d ed. 1970), states: "Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime. [¶] This rule of law applies only to cases of the unconsciousness of persons of sound mind, such as somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind." Defendant objects to the second paragraph of this instruction, arguing that the defense should apply to persons of unsound mind as well as those of sound mind. The People recognize an apparent inconsistency in the decisions of our Supreme Court and the Courts of Appeal on this issue, but urge us to find that unconsciousness is not a defense when the unconsciousness results from an unsoundness of the accused's mind—that is, that diminished capacity cannot amount to unconsciousness, and that unconsciousness is a complete defense, like insanity, and not a partial defense, like diminished capacity. The People submit that when a person of unsound mind is *totally unaware* of his criminal act, his defense is insanity, the same as when he is unable to control his conduct though aware of that conduct. The People recognize that *People* v. *Kitt* (1978) 83 Cal.App.3d 834 [148 Cal.Rptr. 447], concludes that unconsciousness can be shown by mental defect, but frankly urge us to reject it in favor of a return to and reaffirmation of the declaration of *People* v. *Methever** (1901) 132 Cal. 326 [64 P. 481], that the defense of unconsciousness can only be asserted by those of sound mind. The People's argument has much appeal

---

*Overruled on other grounds in *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492].

since it does not becloud and intermingle the distinct categories specified by the language of Penal Code section 26.*

■ However, despite the parties' urging that we resolve the apparently conflicting case law, we decline to do so as it is unnecessary to our decision herein. There was, in this case, simply no evidence of unconsciousness before the jury. ■ An unconscious act within the contemplation of Penal Code section 26 is one committed by a person who is not conscious of acting and whose act cannot therefore be deemed volitional, that is, when there is no functioning of the conscious mind. (*People* v. *Ray* (1975) 14 Cal.3d 20, 25 [120 Cal.Rptr. 377, 533 P.2d 1017]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 717 [112 Cal.Rptr. 1, 518 P.2d 913].) Since defendant himself did not testify, there was no direct evidence of unconsciousness.

Mike Galatioto testified that after the incident defendant denied committing the crime. Such hearsay denials, however, do not indicate unconsciousness. Galatioto also testified that defendant was often forgetful. That too does not raise the defense of unconsciousness. The only other evidence which could arguably be considered as tending to establish unconsciousness at the guilt phase of the trial was the testimony of the psychiatrist, who reported that defendant had told him that he "sort of awakened, if you will, to find himself on the grass." Such testimony was admissible for the limited purpose of showing the information upon which the psychiatrist based his opinion and was inadmissible hearsay if intended to prove the truth of the matter asserted. (See *People* v. *Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256]; *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].) Moreover, the psychiatrist refused to testify that defendant had

---

*Penal Code section 26 states:
"All persons are capable of committing crimes except those belonging to the following classes: "One—Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness.

"Two—Idiots.

"Three—Lunatics and insane persons.

"Four—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.

"Five—Persons who committed the act charged without being conscious thereof.

"Six—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.

"Seven—Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

been unconscious. A criminal defendant has the burden of producing evidence that he was unconscious if he wishes to rely upon that defense. (*People* v. *Cruz* (1978) 83 Cal.App.3d 308, 331 [147 Cal.Rptr. 740].) ▮ In the absence of evidence of unconsciousness it was error for the trial court to instruct on that issue in the first instance, but the error was, of course, harmless to defendant. In concluding that there was no evidence from which the jury could infer that defendant was unconscious when he committed the criminal act, we therefore do not reach the issue whether unconsciousness resulting from mental disease or defect precludes, or permits, unconsciousness as a defense. We here only hold that mere evidence of mental disease or defect, without more, does not raise the defense of unconsciousness and does not entitle the defendant to instructions on that issue.

## III

Defendant next contends that the trial court applied an incorrect standard in determining whether he had regained his sanity. After the jury found that he was insane at the time of the offense the court indicated that it had to consider whether defendant had regained his sanity and stated: "Concerning the Court's view to that point, the Court does not find that the Defendant has fully recovered and finds from the evidence given that he has not fully recovered from the mental illness demonstrated by the evidence." Defendant argues that the court should have considered whether he was still a danger to himself or others.

At the time of trial Penal Code section 1026 (now renumbered § 1026, subd. (a)), provided, inter alia: "If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined...or the court may order the defendant to undergo outpatient treatment...." That section further provided (in what is now § 1026, subd. (b)), that when a defendant has been found guilty of an act which poses a serious threat of harm to another person, the court must direct that the defendant be confined in a state hospital or other mental facility for a minimum period of 90 days before such defendant may be released on outpatient treatment.

Initially, we note that the cases cited by defendant were not concerned with the standard to be applied by a trial court under Penal

Code section 1026, rather, they considered the standard to be applied under former Penal Code section 1026a (now renumbered § 1026.2) which provided the procedure for the release of a person already committed under section 1026. (See *In re Franklin* (1972) 7 Cal.3d 126, 145 [101 Cal.Rptr. 553, 496 P.2d 465]; *In re Lee* (1978) 78 Cal.App.3d 753, 757-758 [144 Cal.Rptr. 528]; *In re Jones* (1968) 260 Cal.App.2d 906, 912 [68 Cal.Rptr. 32]; *People v. Mallory* (1967) 254 Cal.App.2d 151, 155 [61 Cal.Rptr. 825].) The correct standard to be applied by the trial court in determining whether the defendant has regained his sanity under section 1026 has not been the subject of a judicial opinion. We need not consider whether the "danger to himself or others" standard is applicable to the determination under Penal Code section 1026, however, since it does not appear on the record that the trial court in fact applied a different standard.

■ The trial court found, in the express words of the statute, that defendant had not fully recovered from his mental illness. Such a finding and the subsequent order of commitment is a sufficient compliance with section 1026. (See *People v. Scarborough* (1942) 52 Cal.App.2d 210, 212 [125 Cal.Rptr. 893]; *People v. Lee* (1929) 97 Cal.App. 321, 323 [275 P. 815].) Further, it is to be presumed that a trial court rendering a decision knew and applied the proper legal guidelines. (*People v. Belcher* (1969) 269 Cal.App.2d 215, 220 [74 Cal.Rptr. 602].) The trial court's discussion after the return of the jury's finding of insanity indicated awareness of the requirements of Penal Code section 1026, and later discussions with counsel showed that the court was aware of the standard of *In re Franklin, supra.* Despite the judge's awareness of the holding of *Franklin*, he refused to revise his finding that defendant had not regained his sanity, and the evidence fully supports such a finding. We thus find no error.

■ The purpose of a commitment under Penal Code section 1026 is to protect the defendant and the public during the period necessary to appraise the defendant's present sanity. (*In re Franklin, supra*, 7 Cal.3d at p. 136.) The Legislature has deemed an institutional examination period necessary for the special class of persons who have committed crimes and then, by a preponderance of the evidence, proven themselves to be insane. (*Id.*, at pp. 144-145.) The standard proposed by defendant would force a trial court prematurely to evaluate the danger posed by an insane defendant to himself and others, without the benefit of the institutional examination period the Legislature has determined to be

necessary for that very purpose. (*Ibid.*) Moreover, the court would be forced to make the determination upon evidence which was not intended to aid in the resolution of this issue. (*Ibid.*)

The Supreme Court in *Franklin* specifically held that a defendant is not entitled to a precommitment hearing under Penal Code section 1026, but that his right to hearing comes after he has completed the period of his institutional examination. (*Id.*, at pp. 145-147.) This is so because by being found to have been insane at the time of a criminal offense the defendant is not merely a potential danger, but has already been judicially determined to have endangered both the public safety and his own as the result of his mental condition. (*Id.*, at p. 147.) Under such circumstances the defendant may properly be committed for a reasonable evaluation period, and the trial court should limit inquiry to whether the defendant has "fully recovered his sanity." (Pen. Code, § 1026, subd. (a).) If the defendant has not fully recovered his sanity then the court should proceed under section 1026 and order defendant either committed, or treated as an outpatient if the offense did not involve serious threat or bodily harm to others. If the defendant is ordered committed then after 90 days he is entitled to a hearing to determine whether he remains a danger to himself or others and if not then he is entitled to his release. (Pen. Code, § 1026.2.)

The facts of the instant case illustrate this legislative scheme. There was no question that defendant had not regained his sanity. All parties agreed that he had not. There was some question whether he was still dangerous, however. The evidence at trial was not introduced to resolve this issue and was inadequate for that purpose. (See *In re Franklin, supra,* 7 Cal.3d at pp. 143-144.) In order properly to evaluate defendant under the danger to others standard and to provide both sides with an opportunity to be heard on that issue, the trial court would have been required to conduct a precommitment evidentiary hearing, which the Supreme Court specifically disapproved of in *Franklin.* (*Id.*, at p. 144.) ■ The trial court, having determined that defendant was guilty of an offense involving the serious threat of bodily harm to others and that he had not fully recovered his sanity, should not be held to have erred in committing defendant for the 90-day institutional examination period deemed necessary by the Legislature without attempting to resolve the question of defendant's continued dangerousness upon an evidentiary basis inadequate for that purpose. After the 90-day period defendant may either be placed upon outpatient treatment or released. (Pen. Code, §§ 1026.1, 1026.2.)

## IV

Defendant also contends that Penal Code section 1026 provides for discretion in the trial court to order defendant to undergo outpatient treatment without a commitment to a mental health facility even though he has been found to have committed an act involving serious risk of harm to another person. At the time of trial section 1026 provided, inter alia, that if the defendant has been found guilty of certain enumerated crimes or "an act which poses a serious threat of bodily harm to another person, the court shall direct that the defendant be confined in a state hospital or other public or private mental health facility approved by the county mental health director for a minimum of 90 days before such defendant may be released on outpatient treatment pursuant to subdivision (f) of Section 7375 of the Welfare and Institutions Code." Defendant argues that since that section did not state that he must be confined for 90 days prior to release for outpatient treatment under either Welfare and Institutions Code section 7375 *or* Penal Code section 1026.1, that the court retained discretion to order outpatient treatment under Penal Code section 1026.1.

■ The language of Penal Code section 1026 is mandatory. When the defendant has been found to be guilty of an act involving the serious danger of bodily harm to others and has not fully recovered his sanity, then the court "shall" direct that he be confined for a minimum period of 90 days. That this language allows no discretion has already been announced in *People* v. *Hurt* (1979) 90 Cal.App.3d 974, 976-977 [153 Cal.Rptr. 755], with which we agree. The reason Penal Code section 1026.1 was not listed in section 1026 is clear. When a defendant who is found to have been insane at the time of commission of an offense is committed to a mental health facility, his ultimate release for outpatient treatment is provided for by Welfare and Institutions Code section 7375, and not by Penal Code section 1026.1. Penal Code section 1026.1 provides only for outpatient treatment as an initial order without a commitment. When the trial court is precluded from entering an initial order for outpatient treatment, Penal Code section 1026.1 is inapplicable and has no further relevance.

We do not find Penal Code section 1026, as it read at the time of trial, to have been ambiguous, but even were it so the ambiguity must be resolved against defendant's contention. On March 29, 1979, three days after the decision in *Hurt* was filed, Senate Bill No. 1022 was intro-

duced as an emergency measure. (See Stats. 1979, ch. 1114.) That act amended Penal Code section 1026 to provide that a defendant found guilty of certain crimes or of an act posing a serious threat of bodily harm to another and found not to have recovered his sanity shall be committed for a minimum period of 90 days before release for outpatient treatment pursuant to section 1026.1 or subdivision (f) of section 7375 of the Welfare and Institutions Code. An amendment enacted soon after controversies arise as to the interpretation of the original act may be regarded as a legislative interpretation of the original act. (1A Sutherland, Statutory Construction (4th ed. 1972) § 22.31, p. 184.) The trial court correctly determined that it had no discretion to place defendant on outpatient treatment.

## V

We also reject defendant's final contention that a mandatory commitment to a mental health facility for a period of 90 days violates his right to due process. Those arguments were considered and rejected in the case of *In re Franklin, supra,* wherein our Supreme Court held that the California statutory scheme of mandatory commitment violates neither due process nor equal protection of law.

The judgment (order of commitment) is affirmed.

Puglia, P. J., and Reynoso, J., concurred.

A petition for a rehearing was denied August 27, 1980, and appellant's petition for a hearing by the Supreme Court was denied November 12, 1980. Newman, J., was of the opinion that the petition should be granted.