Filed 11/15/24  P. v. Romero CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062460 |
| v. | (Super. Ct. No. 19WF0845) |
| VICTOR MANUEL ROMERO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Victor Manuel Romero was convicted of implied malice murder and hit-and-run driving causing death. On appeal, he contends the trial court prejudicially erred in failing to instruct the jury on the defense of unconsciousness. We disagree and affirm the judgment.

STATEMENT OF FACTS

In the early morning hours of March 30, 2019, defendant was involved in a physical altercation with several other men in a parking garage near Hurricane's Bar in Huntington Beach. During the fight, defendant got hit on the head several times and fell face-first onto the pavement. But when the police arrived in the wake of the fracas, he did not have any visible injuries.

It was apparent that defendant had been drinking, though. Asked how he planned on getting home, defendant told one officer he was going to take an Uber, and he told another officer his sister was coming to pick him up. He then walked toward a stairway that leads to the parking garage pickup area. However, when a bystander asked defendant if he was going to be driving home himself, he nodded in the affirmative. He then walked to his car, fired up the engine, and drove out of the parking garage.

About 10 minutes later, defendant struck and killed a man who was riding his bike near the intersection of Beach and Adams. Although the impact of the collision was severe, defendant kept driving for another half mile before crashing his car into a tree. He then walked back to Hurricane's and began washing his bloody face in a fountain outside the bar. In talking with a man there, defendant claimed he had been carjacked.

A short time later, the police arrived at the fountain and arrested defendant. They then took him to the hospital, where his blood was drawn and later determined to have an alcohol level that was over twice the legal

2

limit for operating a motor vehicle. Defendant also had THC in his system. He reported no complaints of pain or injury, and a CT scan of his head came back negative, meaning he did not have an intracranial bleed or fracture.

When interviewed at the hospital, defendant told the police he started drinking at Hurricane's at about 9:30 p.m. the previous evening. He also used a variety of phrases to explain what happened to him during the altercation in the parking garage. In addition to saying he got "uppercutted" and "fucked up," he repeatedly stated that he "got slept," which is slang for being put to sleep during a fight.[1]

During the interview, defendant also denied driving anywhere after the fight. Upon being told that his car had been involved in a fatal hit-and-run accident, he insisted he "was not in a crash."

Later that morning, at the jail, defendant again denied being in any type of car accident. However, he did admit that he had "fucked up" and that he had previously been convicted of drunk driving. He further conceded that, as part of his prior conviction, he had been warned that he could be charged with murder in the future if he ever killed someone while driving drunk.

Ultimately, that is what defendant was charged with in this case, along with fatal hit-and-run driving. The murder theory was based on implied malice, which required the prosecution to prove that defendant deliberately acted with conscious disregard for human life. (CALCRIM No. 520.)

---

[1] Urban Dictionary, https://www.urbandictionary.com/define.php?term=Got%20slep [as of Nov. 4, 2024].

3

To refute that theory, the defense called Dr. Manuel Saint Martin, a forensic psychiatrist, to testify about how the fight in the parking garage may have affected defendant's cognitive abilities. Based on his review of a video recording of the fight, Dr. Saint Martin opined that defendant likely suffered a concussion, which he described as a mild traumatic head injury, during the altercation.

Dr. Saint Martin explained that a concussion interferes with the brain's neuron connections, which impairs executive functioning. That makes it hard for concussed persons to process and retain information or to determine whether a particular situation or course of action is safe. However, they can still perform "automatic" behaviors, such as walking, talking, and driving.

Asked if a person is "unconscious" when they engage in such automatic behaviors, Dr. Saint Martin answered, "Oh, no, they are not unconscious." But he also made it clear that appearances can be misleading in this situation. In that regard, Dr. Saint Martin testified that it may look like a concussed person's "lights are on" and that "everything is fine for them," but in reality, "nobody is home, meaning . . . they are not thinking, and that's what happens with these concussions."

During his testimony, Dr. Saint Martin also testified about perseveration, which occurs when a person becomes fixated on certain thoughts or behaviors following a head injury. He said defendant's repeated references to getting "slept" during his police interview was a prime example of this phenomenon. According to Dr. Saint Martin, this was not something that defendant consciously chose to do; rather, it was something that he could not help but do because of his head injury.

Speaking to the possible impact of defendant's drinking on his behavior, Dr. Saint Martin acknowledged alcohol consumption and head injuries can produce some of the same symptoms, such as slurred speech and drowsiness. However, he said perseveration is unique to head injuries. Therefore, the fact defendant perseverated during his interview indicated that, in addition to being drunk, he had also suffered a concussion that influenced his thinking and decision-making processes.

Based on Dr. Saint Martin's testimony, defense counsel argued defendant's concussed condition prevented him from forming the necessary mental state for implied malice murder, i.e., conscious disregard for human life. However, the jury convicted defendant as charged, and the trial court sentenced him to an indeterminate term of 15 years to life in prison. This appeal followed.

## DISCUSSION

Defendant claims the trial court had a sua sponte duty to instruct on the defense of unconsciousness. Alternatively, he contends his attorney was ineffective for failing to seek instructions on that defense. For the reasons explained below, we find the evidence was arguably sufficient to warrant instructions on unconsciousness. But we do not believe defendant would have fared any better at trial had such instructions been given. Therefore, assuming instructional error occurred, it is not cause for reversal.

### I.

#### GENERAL LEGAL PRINCIPLES

In criminal cases, it is well established that "even in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles . . . 'of law commonly or closely and

5

openly connected with the facts of the case before the court.' [Citations.]" (*People v. Flannel* (1979) 25 Cal.3d 668, 680–681, italics omitted, superseded by statute on other grounds as stated in *People v. Elmore* (2014) 59 Cal.4th 121, 138.) This sua sponte duty extends to defenses like unconsciousness "'if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Rogers* (2006) 39 Cal.4th 826, 887.)

In this case, defendant did not rely on the defense of unconsciousness. However, that defense was not inconsistent with his theory of the case, which was that his impaired mental state precluded him from acting with conscious disregard for human life. Therefore, the instructional issue comes down to whether or not there was substantial evidence to support an unconsciousness defense. In this context, "substantial evidence" means evidence of unconsciousness that would permit a reasonable jury to find in favor of the defense or harbor a reasonable doubt about defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982–983; *People v. Hanna* (2013) 218 Cal.App.4th 455, 462.)

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. [Citations.] To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.) Conditions giving rise to the defense include "'somnambulism, a blow on the head, or [any other] similar cause'" that

6

prevents the defendant from knowing what he was doing at the time of the alleged offense. (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1083, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 717, overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 165; *People v. Froom* (1980) 108 Cal.App.3d 820, 830.)[2]

## II.

### ANALYSIS

Here, it is undisputed that defendant sustained multiple blows to his head during the altercation that preceded his charged offenses. Not only did he get punched in the head several times, but he also fell face-first onto the pavement at one point during the fight. Coupled with the evidence of defendant's subsequent perseveration when interviewed by the police, this led Dr. Saint Martin to believe defendant suffered a concussion during the fight.

As Dr. Saint Martin explained, a concussion interferes with executive brain functioning and impairs a person's ability to understand their surrounding circumstances. A concussed person can still take in information

---

[2] The standard jury instruction on unconsciousness provides: "The defendant is not guilty of _____ <*insert crime[s]*> if (he/she) acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.] [¶] Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] _____ <*insert a similar condition*>). [¶] [The defense of unconsciousness may not be based on voluntary intoxication.] [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty." (CALCRIM No. 3425, verbatim.)

from their immediate environment, but there is a breakdown in the processing of that information, and that hampers their ability to formulate an appropriate response to the situation or to determine the dangerousness of a particular course of action.

Respondent correctly points out that Dr. Saint Martin also testified that a concussed person is "not unconscious." However, we agree with defendant that, in so testifying, Dr. Saint Martin was referring to unconsciousness in the colloquial sense of the word, meaning knocked out or otherwise incapable of volitional movement. Defendant was not incapacitated in that sense, so from a layperson's perspective, he was not unconscious. In fact, Dr. Saint Martin admitted that, despite being concussed, defendant was able to perform several "automatic" tasks, such as walking, talking and driving.

Nevertheless, in describing what happens to a concussed person, Dr. Saint Martin indicated that appearances can be deceiving. The way he explained it, "the lights [of a concussed person] are on, but nobody is home, meaning, that it looks like everything is fine for them, but they are not thinking . . . ." This suggests defendant was not fully aware of what he was doing after he sustained his head blows.

Granted, defendant lied to the police about how he was going to get home, and he later fled the scene of the fatal accident he caused, which indicates he had some command over his mental faculties. But that would not necessarily defeat his entitlement to instructions on unconsciousness. (See, e.g., *People v. Gana* (2015) 236 Cal.App.4th 598, 609 [unconsciousness instructions warranted even though the defendant intentionally chased down her victims and "gave a detailed accounting of the shooting and her motivation for it shortly after the incident"]; *People v. Chaffey* (1994) 25

8

Cal.App.4th 852, 855-858 [suggesting an unconsciousness defense would have been available to a defendant who drove under the influence of prescription drugs if she had not ingested them voluntarily].)

Considering all of the circumstances, it is difficult to determine whether the evidence rose to the level to trigger the trial court's sua sponte duty to instruct on the defense of unconsciousness. The fact defendant's own expert testified he was not unconscious at the time in question, and defense counsel did not rely on that defense, makes it hard to fault the trial court for failing to instruct on it. But the overall import of Dr. Saint Martin's testimony was such that unconsciousness instructions may have been required, even without a request from the defense. (See generally *State v. Snyder* (N.C.Ct.App. 1984) 319 S.E.2d 668 [in a drunk driving homicide case, the defendant was entitled to raise the defense of unconsciousness based on evidence he had suffered a concussion in a fight before causing the fatal accident]; 2 LaFave, Substantive Criminal Law (2d ed. 2003) § 9.4 at pp. 34-35 [an unconsciousness defense may be available when the defendant's condition is brought about by a concussion or other physical trauma].)

However, even if unconsciousness instructions were required, "[t]he absence of an instruction on a defense is not prejudicial if "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding [favorable to the defendant] has been rejected by the jury.""" (*People v. Gana, supra,* 236 Cal.App.4th at p. 610, quoting *People v. Wright* (2006) 40 Cal.4th 81, 98.)

9

As to the charge of implied malice murder, defendant's jury was instructed that crime required the prosecution to prove 1) defendant intentionally committed an act; 2) the natural and probable consequences of which were dangerous to human life; 3) defendant knew the act was dangerous to human life; and 4) he acted with conscious disregard of that risk. (CALCRIM No. 520.) In other words, the jury was required to examine defendant's subjective state of mind to ascertain whether he actually appreciated the deadly risks associated with his conduct and consciously disregarded those risks. (*People v. Knoller* (2007) 41 Cal.4th 139, 143; *People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.) By finding defendant guilty of implied malice murder, the jury necessarily determined that he did, which is inconsistent with the defense of unconsciousness. Indeed, the jury's conclusion that defendant acted in conscious disregard to human life is irreconcilable with the notion that he was unconscious when he plowed his car into the victim's bicycle. (*Sajor-Reeder v. Cavazos* (C.D.Cal. Dec. 23, 2013, No. CV 11-5701 VAP (FFM)) 2013 U.S.Dist.LEXIS 180477, *20, affd. (9th Cir. 2015) 605 Fed.Appx 679; *Doster v. Harrington* (C.D.Cal. Aug. 2, 2010, No. ED CV 10-707-VBF(E)) 2010 U.S.Dist.LEXIS 129106, *7-8; *Hernandez v. Hamlet* (N.D.Cal. June 7, 2003, No. C 02-3657 SI (pr)) 2003 U.S.Dist.LEXIS 9740, *8.) Accordingly, any error in failing to instruct on the defense of unconsciousness was patently harmless. (*Ibid*.; cf. *People v. Heard* (2003) 31 Cal.4th 946, 982 [jury's finding the defendant acted with specific intent to commit the charged sex offense rendered any error in failing to instruction on unconsciousness "clearly harmless"].)

For the same reason, defense counsel was not ineffective for failing to request instructions on unconsciousness. Because it is not reasonably probable that defendant would have obtained a more favorable

verdict had the trial court instructed on that defense, he cannot establish the necessary prejudice to prove a violation of his Sixth Amendment right to competent representation at trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *People v. Carrasco* (2014) 59 Cal.4th 924, 982; *People v. King* (2010) 183 Cal.App.4th 1281, 1298.)

## DISPOSITION

The judgment is affirmed.


DELANEY, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


GOODING, J.

11