Filed 4/22/25  P. v. Gunnarsson CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL GUNNARSSON,<br><br>Defendant and Appellant. | F087089<br><br>(Super. Ct. No. BF185572A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian Whitney and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2023, a jury convicted appellant Daniel Gunnarsson of first degree murder (Pen. Code, § 187, subd. (a);[1] count 1) for the stabbing death of Kathryn Pham. The jury found true that appellant personally used a deadly weapon during this murder. The jury also convicted appellant of mutilating Pham's corpse (Health & Saf. Code, § 7052, subd. (a); count 2).[2] Appellant received an indeterminate prison term of 25 years to life, plus a consecutive one-year for the deadly weapon enhancement, plus a consecutive determinate term of 16 months.

Appellant raises claims of instructional and evidentiary errors. We reject his arguments on their merits and find any presumed errors to be harmless. We affirm.

## BACKGROUND

Appellant does not challenge the sufficiency of the evidence supporting his judgment. We summarize the material trial facts.

### I. Appellant's Relationship with Pham.

Appellant was in a romantic relationship with Pham. They were seeing each other for about one month before this murder occurred. On or about the day before this homicide, appellant and Pham had a dispute or argument. Appellant appeared distraught and possibly suicidal.

On the morning of this homicide, appellant apologized to Pham over the telephone. She agreed that he could pick her up and take her to his stepfather's residence. Later that same morning, appellant and Pham were seen standing outside a detached RV garage on the property of appellant's stepfather. They were near a side door and looking inside the garage.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] Relevant in this case, a person is guilty under Health and Safety Code section 7052 if he "willfully mutilates" or "commits an act of sexual penetration on, or has sexual contact with, remains known to be human, without authority of law." (Health & Saf. Code, § 7052, subd. (a).)

## II.    The Murder.

This murder occurred inside the detached RV garage on the property of appellant's stepfather.  Appellant used a mountaineering ice pick to kill Pham.  The pick belonged to appellant's stepfather, and it was regularly stored inside that garage.  Appellant struck Pham 14 times with the pick.  Three of the blows penetrated Pham's skull and brain.

When this fatal attack occurred, three painters were working on the stepfather's property near and around the detached RV garage.  The painters' equipment created a lot of noise.  While working, some of the painters thought they heard a scream, but they were uncertain due to the noise of their equipment.  About 20 minutes later, one of the painters opened a door to the detached garage and this murder was discovered.

Appellant was inside the garage standing on a ladder and holding a tie down strap.  Pham's lifeless body was lying on a mattress.  A substantial amount of blood had pooled on the ground.  Based on drag marks, it appeared that appellant had pulled Pham's body across the ground to the mattress.  The bloody ice pick was found partially concealed under Pham's left upper thigh.

Appellant had blood on him.[3]  Nobody else was present inside the garage.  Nobody had been seen entering the garage.

In his opening brief, appellant admits that he "killed his girlfriend Katie Pham with an ice axe in his stepfather's RV garage."  He was 20 years old when he killed Pham.

## III.    Appellant's Manipulation of Pham's Corpse.

The mattress on which Pham was lying was not normally on the floor of the RV garage.  Near Pham's body, a mirror had been positioned so that, if someone was lying

---

**3**     Approximately seven witnesses observed appellant on the morning that this homicide was discovered.  At trial, these witnesses provided markedly different opinions regarding the amount of blood seen on appellant's person.  For instance, two witnesses testified that appellant was "covered" in blood, while others recalled only seeing "a few drops of blood" on him or "not a lot of blood" on him.

on her body, that person could see themselves and Pham in the mirror. Pham's pants were pulled down and her shirt was pulled up. Law enforcement found an unused condom "right next to" Pham's body. The same brand of condoms was located both inside appellant's vehicle and at his residence. Based on the position of Pham's body, the state of her clothes, and the position of the mirror, law enforcement believed a sexual assault had occurred. In his opening brief, appellant concedes that, after killing Pham, he "arranged her partially undressed body on a mattress in front of a mirror."

Bloody streaks were found just below Pham's left buttocks. She had bruising to her hymen and labia minora. There was no way to determine when that bruising occurred.

Appellant was clothed when this crime was discovered. His deoxyribonucleic acid (DNA) was not discovered either on Pham's body[4] or on the ice pick. Latex gloves were located in the garage near the area of this attack. The gloves did not belong to appellant's stepfather.[5]

## IV. The Testimony from Appellant's Jail Cellmate.

At trial, appellant's prior jail cellmate testified against him. At the time of this trial, the former cellmate, Nicholas Casteel, had three felony convictions for arson. Casteel had been housed with appellant in jail for three to four months.

Casteel told the jury about certain statements that appellant had made to him while they were housed together. It was Casteel's understanding that Pham had been planning to stop seeing appellant because of his drug use. Casteel believed that appellant had wanted his relationship with Pham to continue.

---

[4] DNA from an unknown male was discovered on swabs taken from Pham's vagina and around her rectum.

[5] During closing argument, the prosecutor argued that appellant's DNA was not discovered on the murder weapon because he had worn gloves.

4.

According to Casteel, appellant said he took Pham "to his dad's house" and, once there, he lost control of his emotions. Appellant said he "began to hit her repeatedly." Appellant stated that he "didn't want to hit her in the face but then when he started hitting her in the face, he kinda [*sic*] lost control of [himself]." Appellant said that, on the way to his stepfather's residence, he had told Pham that he planned to hurt her, but she had thought he was joking. When speaking with Casteel, appellant never admitted killing Pham, but he "admitted to inflicting serious injuries to [her]." Appellant said he used "a pick" to hurt her.

At trial, Casteel testified that, when speaking with appellant, appellant had claimed to him that he had "blacked out" and he had "lost mental awareness" when he attacked Pham. During their conversations, appellant never expressed any remorse to Casteel for what he had done to Pham.

## V.     Appellant's Bizarre Behavior.

Just after this murder was discovered, appellant was inside the garage standing on a ladder and holding a tie down strap. After appellant got down from the ladder, he appeared "lost" and confused. He was pacing. He was mumbling and incoherent. He was hitting his head with his hands.

Law enforcement personnel were summoned, and they responded to the scene. A responding deputy reported that appellant had "a blank stare" when the deputy encountered appellant on the property shortly after this murder. It seemed to the deputy that appellant might not have been "fully there." Appellant did not respond when asked if he was hurt or injured. To the deputy, appellant appeared "emotionless."

A sample of appellant's blood tested negative for alcohol and "amphetamines, benzodiazepines, cocaine, opiates, cannabinoids, and also phencyclidine, which is PCP." Analysis of appellant's urine sample had similar results, but it was positive for cannabinoids.

## DISCUSSION

**I.    The Trial Court Did Not Err in Failing to Instruct the Jury on the Doctrine of Unconsciousness and Any Presumed Error is Harmless.**

At trial, Casteel testified that, when speaking with appellant, appellant had claimed to him that he had "blacked out" and he had "lost mental awareness" when he attacked Pham. Based on Casteel's testimony, appellant asked the court to instruct the jury with CALCRIM No. 3425 regarding the doctrine of unconsciousness. The court ultimately failed to instruct the jury to consider whether appellant was unconscious when he killed Pham.

Appellant argues that the court erred, and the jury should have been instructed on the doctrine of unconsciousness. We disagree. The trial court did not err, and any presumed error is harmless.

### A.    *Instructional error did not occur.*

"The general rule is that in a criminal case the trial court must instruct on the 'principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.]' [Citation.]" (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1172.) A jury instruction must be given if it is supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40.)

Unconsciousness is a complete defense to criminal conduct. (§ 26, item Four; *People v. Halvorsen* (2007) 42 Cal.4th 379, 417; *People v. Rogers* (2006) 39 Cal.4th 826, 887.) Thus, a defendant is not guilty of a charged offense if he "acted while unconscious." (CALCRIM No. 3425.) However, a presumption generally exists in California that a person who appears to act in an apparent state of consciousness is

6.

actually conscious.  (See *People v. Hardy* (1948) 33 Cal.2d 52, 63–64; *People v. Nihell* (1904) 144 Cal. 200, 202.)

"To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.]" (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 417.)  CALCRIM No. 3425 provides that unconsciousness may be caused by, among other things, a blackout.  (CALCRIM No. 3425.)  "If the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense.  [Citation.]" (*People v. Halvorsen*, at p. 417.)

In this matter, substantial evidence did not support an instruction on unconsciousness.  Appellant drove Pham to his stepfather's residence.  On the drive over, he told her that he planned on hurting her, but she thought he was joking.  He never admitted killing her, but "admitted to inflicting serious injuries to [her]."  He said he used "a pick" to hurt her.  Appellant told Casteel that he lost control of his emotions and "began to hit her repeatedly."  He "didn't want to hit her in the face but then when he started hitting her in the face, he kinda [*sic*] lost control of [himself]."

Appellant's statements to Casteel amply demonstrate that he consciously attacked Pham.  Moreover, appellant struck Pham 14 times with the ice pick, including three blows that penetrated her skull and entered her brain.  Pham's body was found lying on a mattress.  Her shirt was up and her pants were down.  A mirror was positioned so that, if a person was lying on top of Pham's body, that person could see both of them in the mirror.  Pham had bruising to her genitals, and a bloody streak was on her buttocks.  Latex gloves were found at this crime scene.

A reasonable inference may be drawn from the evidence that appellant planned this attack, and he wore gloves when he fatally injured Pham.  A reasonable inference may be also drawn that, after killing her, appellant moved Pham's body to the mattress, he rearranged her clothes, and he touched her body for sexual gratification.  Appellant's

7.

own statements and the nature of this attack overwhelmingly demonstrate that he engaged in goal-oriented behavior. Indeed, the complex and purposeful nature of appellant's conduct strongly suggests he "did not lack awareness of his actions during the course of the offenses." (*People v. Halvorsen, supra*, 42 Cal.4th at p. 418.)

Appellate courts have consistently held that more than a defendant's own statements of forgetfulness are required for an instruction on unconsciousness. (See *People v. Rogers, supra*, 39 Cal.4th at p. 888; *People v. Froom* (1980) 108 Cal.App.3d 820, 829–830; *People v. Heffington* (1973) 32 Cal.App.3d 1, 10; *People v. Coston* (1947) 82 Cal.App.2d 23, 40.) In this trial, appellant did not call an expert witness to opine on whether he may have been unconscious when he killed Pham.

Based on this record, appellant's own statements do not represent substantial evidence sufficient to support an instruction on the doctrine of unconsciousness (CALCRIM No. 3425). Nothing corroborates appellant's self-serving claim that he blacked out when fatally injuring Pham. Consequently, the court did not err. In any event, we also hold that any presumed error is harmless.

**B.** ***Any presumed error is harmless.***

Appellant argues that his judgment should be reversed per se without any analysis for prejudice. In the alternative, he contends that reversal is required under either the federal standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or the state standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

We reject appellant's various assertions regarding prejudice.

**1.      This issue is subject to harmless error analysis.**

Appellant notes that the California Supreme Court has yet to decide the standard of prejudice for the failure to instruct on an affirmative defense supported by substantial evidence. We agree. (See *People v. Schuller* (2023) 15 Cal.5th 237, 260; *People v. Gonzalez* (2018) 5 Cal.5th 186, 199.) However, we disagree with appellant's claim that analyzing for assumed prejudice is inappropriate.

8.

The alleged instructional error which appellant raises here did not impact the framework within which this trial proceeded. As such, a structural error is not present. Thus, reversal per se is not warranted. (See *People v. Aranda* (2012) 55 Cal.4th 342, 363–364 [examples of structural error include the denial of counsel or of self-representation, racial discrimination in jury selection, and trial with a biased judge].)

Moreover, in 2006, our high court conducted a harmless error review when a trial court failed to instruct on the doctrine of unconsciousness in a capital murder trial. (*People v. Boyer* (2006) 38 Cal.4th 412, 470.) The Supreme Court found the error harmless "by any applicable standard" because ample evidence demonstrated the defendant had committed the murder, and he was conscious when doing so. (*Ibid.*) Accordingly, we reject appellant's contention that reversal per se is warranted. Even if we presume that instructional error occurred, it is appropriate to analyze alleged prejudice.

### 2. There is no prejudice under either standard of review.

To demonstrate prejudice, appellant points to his "bizarre" and "unusual" behavior before and after this fatal encounter. The night before he killed Pham, appellant appeared dejected and possibly suicidal over his relationship with her. On the morning of this homicide, he still appeared very upset over his relationship with Pham.

Just after this murder was discovered, appellant was inside the garage standing on a ladder and holding a tie down strap. After appellant got down from the ladder, he appeared "lost" and confused. He was pacing. He was mumbling and incoherent.

A responding deputy reported that appellant had "a blank stare" when the deputy first encountered appellant after this murder. It seemed to the deputy that appellant might not have been "fully there." Appellant did not respond when asked if he was hurt or injured. To the deputy, appellant appeared "emotionless."

Appellant contends that, based on the totality of the evidence, a reasonable inference may be drawn that he blacked out when killing Pham. As such, he asserts that

9.

the court's failure to instruct the jury with CALCRIM No. 3425 cannot be deemed harmless. We disagree.

The evidence overwhelmingly demonstrated that appellant was conscious when he fatally attacked Pham. He violently struck her numerous times with the ice pick, including three blows that penetrated her brain. He moved her body and positioned her clothing so he could sexually touch her. He placed a mirror in a position so that he could see himself while on top of her body. The totality of appellant's conduct shows he was purposeful and deliberate.

Moreover, appellant said he had planned to hurt Pham before they arrived at the detached garage. Appellant admitted using the pick to inflict serious injuries to Pham. Appellant said that, once he started hitting Pham in her face, he lost control of himself and he hit her repeatedly. Appellant's statements to Casteel overwhelmingly demonstrate he was aware he was attacking Pham when this fatal encounter occurred.

Based on the evidence surrounding this murder, coupled with appellant's statements to Casteel, we can declare beyond any reasonable doubt that any presumed instructional error did not contribute to the verdicts against appellant. (See *Chapman, supra,* 386 U.S. at p. 24.) There is proof beyond a reasonable doubt that appellant acted as if he were conscious. (See CALCRIM No. 3425.) The guilty verdicts rendered in this trial were surely unattributable to the alleged error in failing to instruct the jury on the doctrine of unconsciousness. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) No rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict appellant absent this presumed instructional error. (See *People v. Schuller, supra,* 15 Cal.5th at p. 244 [setting forth this standard].) Likewise, it is not reasonably probable the verdicts would have been more favorable to appellant absent this presumed instructional error. (See *Watson, supra,* 46 Cal.2d at p. 836.) Consequently, prejudice is not present under either standard of review, and this claim fails.

**II.     The Trial Court Did Not Abuse Its Discretion in Prohibiting Introduction of Other Portions of Casteel's Interview and Any Presumed Error is Harmless.**

Prior to trial, authorities interviewed Casteel when he was in prison custody. During that interview, Casteel recalled prior conversations with appellant. According to Casteel, appellant had claimed that he "had delusions of being Jesus." Appellant told Casteel that he had "wanted to crucify" Pham, and he had "set up" something in the garage in order to crucify her. Appellant told Casteel that he had previously used "acid," but not on the morning of this crime. According to Casteel, appellant had expressed that he was becoming paranoid and thinking he was Jesus. Appellant told Casteel that "either Jesus told him to crucify [Pham] or that he felt like Jesus, and he was going to crucify her. It was one of those."

On trial cross-examination, Casteel agreed that, when speaking with appellant, appellant had told him that "he [appellant] was having delusions about being Jesus." During cross, defense counsel attempted to elicit more testimony from Casteel about appellant's statements regarding his delusions and prior drug use. The trial court, however, sustained numerous hearsay objections from the prosecutor in that regard, and the jury did not hear further about those topics.

The defense subsequently moved in writing to reopen cross-examination of Casteel or, in the alternative, to strike his testimony. The defense argued that all of appellant's statements to Casteel were necessary under Evidence Code section 356 for a complete understanding of their conversation, and so the jury would understand that appellant attacked Pham due to his delusion.

Evidence Code section 356 deals with the rule of completeness. When part of a conversation is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party. When a conversation is given in evidence, any other conversation "which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.)

11.

During the hearing on this motion, the trial court went through Casteel's relevant trial testimony line-by-line. In each instance, the court concluded that appellant's admitted statements to Casteel were complete, and they did not need further clarification under Evidence Code section 356.

In the present claim, appellant argues that the trial court abused its discretion in preventing the defense from eliciting the additional testimony from Casteel. According to appellant, this evidence was admissible under Evidence Code section 356. He maintains that the testimony about his delusions was relevant regarding whether he acted with premeditation and deliberation, arguing his delusions "undermined" any inference that he premeditated this killing.[6] Appellant contends that, without the full conversation, the prosecutor was permitted "to paint a misleading picture of the evidence of appellant's intent." Appellant asserts that the trial court abused its discretion because it did not view Casteel's testimony in the aggregate but, instead, it examined each statement in isolation.

We reject appellant's arguments. The trial court did not abuse its discretion. In any event, any presumed error is harmless.

### A. *The trial court did not abuse its discretion.*

An abuse of discretion standard is used to review a trial court's determination of whether evidence is admissible under Evidence Code section 356. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.) The "trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377; *People v. McDowell* (2012) 54 Cal.4th 395, 430.)

The purpose of Evidence Code section 356 is to prevent a party from using select aspects of a conversation "to create a misleading impression" on the subject presented to the jury. (*People v. Arias* (1996) 13 Cal.4th 92, 156.) Here, the admitted portions of

---

[6] CALCRIM No. 627 permits a jury to consider "evidence of hallucinations" in deciding whether a defendant "acted with deliberation and premeditation."

12.

appellant's conversation with Casteel did not create a misleading impression. In other words, appellant's alleged delusions about being Jesus, his claim of prior paranoia, and his claims of prior acid use were not necessary for the jury to understand those portions of his statements that were admitted into evidence. The trial court carefully and thoroughly reviewed all the evidence with the parties when ruling on appellant's motion. The court acted well within its discretion when it ruled that appellant's additional comments did not fall under Evidence Code section 356.

This record does not demonstrate that the court's evidentiary ruling was irrational or arbitrary so that no reasonable person could agree with it. Consequently, an abuse is not present and this claim fails. In any event, we also conclude that any presumed error is harmless.

### B.     *Any presumed error is harmless*.

Appellant argues that the exclusion of his additional statements regarding his delusions violated his rights to due process. Appellant contends that, without the additional testimony about his delusions, the jury was left with "a wildly inaccurate impression" regarding his criminal intent, and the jury found premeditation because it had "misleading evidence." Appellant asserts that, under the *Chapman* standard, his murder conviction must be reversed, or, in the alternative, his murder conviction must be reduced to second degree. Appellant maintains that he was prevented from presenting a complete defense. We disagree.

As a general matter, the ordinary rules of evidence do not impermissibly infringe on a defendant's right to present a defense. (*People v. Robinson* (2005) 37 Cal.4th 592, 626; *People v. Hall* (1986) 41 Cal.3d 826, 834.) The harmless error test of *Watson* is used to analyze an evidentiary error that involves state law. (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) Indeed, our high court has used the *Watson* standard of review to analyze prejudice for a trial court's alleged violation of Evidence Code section 356. (See *People v. Arias*, *supra*, 13 Cal.4th

13.

at pp. 156–157.) Accordingly, we reject appellant's reliance on *Chapman*. Instead, we will review alleged prejudice under *Watson*. The question is whether it is reasonably probable the verdicts would have been more favorable to appellant absent this presumed evidentiary error. (*Watson, supra,* 46 Cal.2d at p. 836.) The answer is no.

At one point during Casteel's trial cross-examination, the jury heard about appellant's alleged delusion. Casteel agreed with defense counsel's query that appellant had said "he was having delusions about being Jesus." That answer was not stricken from the record. As such, the jury did learn that appellant had claimed he had a delusion about being Jesus. Nevertheless, the evidence overwhelmingly established that appellant premeditated this fatal attack. Appellant reported to Casteel that he had planned to hurt Pham as he drove her to his stepfather's residence. Appellant stated that he did not want to hit her in the face but, once he did so, he lost control.

Appellant stabbed Pham 14 separate times, three of which penetrated her brain. A violent and bloody death sustained as a result of multiple stab wounds is consistent with a finding of premeditation. (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

Appellant placed Pham's body on a mattress. Her top was pulled up and her pants were pulled down. Markings on her buttocks strongly suggested that appellant touched her there. A mirror was positioned so that, if someone was lying on Pham's body, that person could see both of them in the mirror. The totality of the evidence amply demonstrates appellant's planning and deliberation.

During closing argument, the defense argued it was possible someone else had committed this murder, noting that no DNA linked appellant to Pham's death. The defense asserted it was possible appellant had heard Pham scream from inside the garage and he had then entered the garage to investigate. The defense argued that, even if appellant had killed Pham, he could not have premediated the act because he was not in the right state of mind. The defense reminded the jurors about appellant's strange behavior leading up to this fatal incident. The defense noted that Casteel had a motive to

14.

lie to get a reduced prison sentence. The defense maintained that Casteel's statements lacked credibility. The defense suggested that appellant could have been provoked to attack Pham. The defense repeatedly asserted that the evidence did not establish premeditation.

The jury rejected the defense's position. The jury had the option of finding appellant guilty of second degree murder or voluntary manslaughter. The jury, however, found appellant guilty of first degree murder.

Based on this record, it is not reasonably probable the verdicts in this matter would have been more favorable to appellant had the trial court permitted appellant to introduce more evidence regarding his statements to Casteel. Consequently, appellant did not suffer prejudice. Accordingly, appellant's various arguments are without merit, and this claim fails.

## **DISPOSITION**

The judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.

15.